UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| THOMAS T. MCDOUGLE and ROSEMARIE TAYLOR, for themselves and other similarly situated employees<br>Plaintiffs<br><br>v.<br><br>DAKOTA OF ROCKY HILL, LLC<br>Defendant | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL NO.: 3:17-CV-00245-SRU<br><br><br><br><br><br><br><br>NOVEMBER 9, 2018 |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR CONDITIONAL CERTIFICATION AND FOR NOTICE TO BE ISSUED PURSUANT TO 29 U.S.C. § 216(b)**

## <u>TABLE OF CONTENTS</u>

Page(s)

INTRODUCTION.....................................................................................................1

FACTS .....................................................................................................................3

    Background on Plaintiffs..........................................................................................4

    The Server Position at Dakota. .................................................................................5

        In Addition To Tips And Service Charges, Dakota's Servers Are Paid The
        *Connecticut* Server Tip Credit Wage (currently $6.38), Which Is
        Slightly Less Than The Full, Non-Server FLSA Minimum Wage Of
        $7.25.............................................................................................................5

        Dakota's Servers Receive Notice of Their Compensation Structure Through
        Several Means...............................................................................................6

            Dakota's Server Advertisements and Written Orientation Materials
            Inform Servers of Relevant Information About Their Tips and
            Compensation. ............................................................................7

            During Orientation, Servers are Given Oral Notice Regarding Relevant
            Information About Their Tips and Compensation .......................7

            On the First Day (and Every Day) Servers Work, Servers Go Through A
            "Tip-Out"/"Cash Out" Procedure Where Servers And A Dakota
            Manager Go Over The Tips That The Server Earned And How
            Much of Those Tips The Server Will Retain...................................8

            During Orientation, Servers Have Ample Opportunity to Ask Dakota
             Managers Questions About Their Compensation That Could
            Result In Answers Relevant To The FLSA Notice. ...........................9

            Dakota Wage Statements Clearly List the Server Rates and All The Tips
             That Are Retained By the Servers.................................................10

            Servers also attend Periodic Staff Meetings Where Servers are Given
            Oral Notice Regarding Relevant Information About Their Tips
            and Compensation. .....................................................................11

            The Connecticut Posters Provide The Relevant Information Required by
            the DOL's FLSA Tip Notice Rule....................................................12

            Starting in February 2017, Dakota Provided Additional Written Notice.
            ....................................................................................................13

        Plaintiff Taylor Concedes That She—And Other Servers—Would Not Work At
        Dakota If Servers Made $10.10 Per Hour In Total Compensation, Even
        Though That Is Approximately 50% More Than FLSA Minimum Wage....15

        Plaintiffs Have No Evidence Regarding What Others in the Putative Class Were
        Told About Their Compensation Structure. ...................................................16

i

**PROCEDURAL HISTORY:  THE PRIOR CLASS ACTION LAWSUIT AGAINST DAKOTA AND THE BACKGROUND OF PLAINTIFFS' MOTION** ................... 17

Dakota was Previously Sued by The Hayber Law Firm In A Class Action Alleging Connecticut Class Claims That Servers Were Improperly Paid The Tip Credit Wage, And The Connecticut Court Denied Class Certification. ........................... 17

This Court Denied Without Prejudice Plaintiffs' Prior Pre-Discovery Motion for FLSA Conditional Certification, So The Parties Could Engage In Discovery Relevant To Plaintiffs' Motion. ............................................................................................... 18

**LAW AND ARGUMENT** ....................................................................................... 20

The Regulatory Purpose of the FLSA is Not Offended by Plaintiffs' Claims In This Case As Plaintiffs Earn Triple, and In Some Cases, Quadruple, The *Federal* Minimum Hourly Wage. ........................................................................................................... 20

FLSA Conditional Certification Standard: Plaintiffs Cannot Meet Their Burden To Certify A Collective Under A Heightened Standard Or The Conditional Certification Standard Articulated In *Glatt*. .......................................................... 21

This Court Should Apply A Heightened Standard Of Review Because The Parties Completed Substantial Discovery On The FLSA Notice Issue. ............... 22

Even If This Court Does Not Apply A Heightened Standard, The Second Circuit's Recent *Glatt* Decision Makes Clear That Conditional Certification Is Inappropriate Under the Lenient Pre-Discovery Standard. ...................... 23

Plaintiffs Have No Viable FLSA Notice Claim Because Plaintiffs (And All Servers) Had Multiple Forms Of Written And Oral Notice, All Of Which More Than Covers (Repeatedly) The FLSA Tip Credit Notice Requirements. .................................. 24

Many Courts Take A Practical And Commonsense Approach To The Tip Credit Notice Requirements And Find That Employers Can Use The Tip Credit Even If They Do Not Engage In A Rigorous Explanation Of The Tip Credit With Employees. ........................................................................... 26

Dakota's Connecticut Labor Poster Is Sufficient To Inform The Servers Of The Tip Credit Under Section 3(m) Of The FLSA And, At Minimum, Four Of The Five Requirements Under The DOL Regulation. .............................. 32

Even Assuming The FLSA Requires That Servers Must Be Informed Of All Five Points In The DOL Regulation, Dakota Did Inform The Servers Of All Five Points. ........................................................................................... 33

Even Assuming This Court Finds That Servers Must Be Informed Of All Five Points In The DOL Regulation, And Even Assuming This Court Does Not Make A Merits Determination, This Court Should *Still* Deny Conditional Certification Because Individualized Inquiries Are Necessary To Determine What Each Server Was Told Regarding His/Her Compensation. ............................................................... 35

**IF THE COURT GRANTS CONDITIONAL CERTIFICATION, IT SHOULD NOT ADOPT PLAINTIFFS' PROPOSAL REGARDING THE NOTICE.** ...................... 38**

**Plaintiffs Have Not Established Any Legal Basis for Equitable Tolling.** .................. 38

**Plaintiffs' Proposed Notice Is Flawed.** ......................................................................... 39

**CONCLUSION** ............................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amendola v. Bristol-Meyers Squibb Co.*,
    558 F. Supp. 2d 459 (S.D.N.Y 2008)....................................................................22

*Arena v. Plandome Taxi, Inc.*,
    No. Civ. 12-1078, 2013 U.S. Dist. LEXIS 58169 (E.D.N.Y. Apr. 23, 2013) ........................39

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011)...................................................................................18

*Barcellona v. Tiffany English Pub, Inc.*,
    597 F.2d 464 (5th Cir. 1979) .............................................................................27

*Bittencourt v. Ferrera Bakry & Café, Inc.*,
    310 F.R.D. 106 (S.D.N.Y. 2015) .........................................................................28

*Bonham v. Copper Cellar Corp.*,
    476 F. Supp. 98 (E.D. Tenn. 1979).......................................................................27

*Boos v. Runyon*,
    201 F.3d 178 (2d Cir. 2000)..............................................................................38

*Bunyan v. Spectrum Brands, Inc.*,
    Case No. 07-CV-0089-MJR, 2008 U.S. Dist. LEXIS 59278 (S.D. Ill. July 31,
    2008) ..................................................................................................22

*Cheeks v. Freeport Pancake House, Inc.*,
    796 F.3d 199 (2d Cir. 2015)..............................................................................20

*Clarke v. JP Morgan Chase Bank, N.A.*,
    08 Civ. 2400(CM)(DCF), 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. Mar. 26,
    2010) ..................................................................................................14

*Cruz v. Chesapeake Shipping, Inc.*,
    932 F.2d 218 (3d Cir. 1991)..............................................................................20

*D'Antuono v. C & G of Groton, Inc.*,
    No. 11-CV-0033 (MRK), 2011 U.S. Dist. LEXIS 135402 (D. Conn. Nov. 23,
    2011) ..................................................................................................39

*Davis v. Charoen Pokphand (USA), Inc.*,
    303 F. Supp. 2d 1272 (M.D. Ala. 2004) ..................................................................23

*Dunlop v. Ashy*,
   555 F.2d 1228 (5th Cir. 1977) ..............................................................................20

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ..........................................................................................25

*Fernandez v. Zoni Language Ctrs., Inc.*,
   Docket No. 16-689-cv, 2017 U.S. App. LEXIS 9178 (2d Cir. May 26, 2017) .....................20

*Galberth v. Dakota, et al.*,
   Dkt. No. HHD-CV-05-4022181s(x03) ....................................................................18

*Garcia v. Palomino*,
   738 F. Supp. 2d 1171 (D. Kan. Sept. 7, 2010).....................................................32

*Glatt v. Fox Searchlight Pictures, Inc.*,
   811 F.3d 528 (2d Cir. 2016)........................................................................ *passim*

*Hendricks v. J.P. Morgan Chase Bank*,
   263 F.R.D. 78 (D. Conn. 2009)..............................................................................22

*Hernandez v. Jrpac Inc.*,
   14 Civ. 4176(PAE), 2016 U.S. Dist. LEXIS 75430 (S.D.N.Y. June 9, 2016)..................28, 29

*Hewett v. Triple Point Tech., Inc.*,
   171 F. Supp. 3d 10 (D. Conn. 2016) ......................................................................28

*Hoffmann-La Roche Inc. v. Sperling.*,
   493 U.S. 165 (1989).................................................................................................22

*Ide v. Neighborhood Restaurant Partners, LLC*,
   32 F. Supp. 3d 1285, 1290 (N.D. Ga. 2014), *aff'd*, 667 Fed. Appx. 746 (11th
   Cir. 2016) ..............................................................................................................27

*Kilgore v. Outback Steakhouse*,
   160 F.3d 294 (6th Cir. 1998) ................................................................9, 10, 27, 28

*Martin v. Tango's Rest., Inc.*,
   969 F.2d 1319 (1st Cir. 1992)..........................................................................27, 28

*Menominee Indian Tribe v. United States*,
   136 S. Ct. 750 (2016)..............................................................................................38

*Mike v. Safeco Ins. Co. of America*,
   274 F. Supp. 2d 216 (D. Conn. 2003).....................................................................14

*Monahan v. Cnty of Chesterfield*,
   95 F.3d 1263 (4th Cir. Sept. 17, 1996) ..................................................................20

v

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)...............................................................21, 35

*Orozco v. Darden Restaurants, Inc.*,
   X03CV044022118S, 2006 Conn. Super. LEXIS 2380 (Conn. Super. Ct. Aug.
   3, 2006) ..........................................................................................18

*Pellon v. Bus. Representation Int'l Inc.*,
   528 F. Supp. 2d 1306 (S.D. Fla. 2007), *aff'd* 2008 U.S. App. LEXIS 19077
   (11th Cir. Sept. 3, 2008).................................................................26, 27, 33

*Porter v. West Side Rest., LLC*,
   Case No. 13-1112-JAR-KGG, 2014 U.S. Dist. LEXIS 57126 (D. Kan. Apr.
   24, 2014) .........................................................................................32

*Reich v. Chez Robert, Inc.*,
   28 F.3d 401 (3d Cir. 1994)..............................................................28, 29

*Roberts v. Apple Sauce, Inc.*,
   945 F. Supp. 2d 995 (N.D. Ind. 2013) ................................................38

*Rosario v. Compass Grp., USA, Inc.*,
   No. 3:15-CV-00241, 2016 U.S. Dist. LEXIS 14078 (D. Conn. 2016)............22, 24

*Rudd v. T.L. Cannon Corp.*,
   No. 3:10-CV-0591(TJM)(DEP), 2011 U.S. Dist. LEXIS 21061 (N.D.N.Y. Jan.
   4, 2011) ...........................................................................................24

*Shala v. Dimora Ristorante, Inc. et. al.*,
   Civ No. 2:16-03064(WJM), 2016 U.S. Dist. LEXIS 176316 (D.N.J. Dec. 21,
   2016) ...........................................................................................21, 37

*Stebbins v. S&P Oyster Co.*,
   Civil No. 3:16-cv-992(AWT), 2017 U.S. Dist. LEXIS 216367 (D. Conn. Sept.
   1, 2017) ..................................................................................... *passim*

*Upadhyay v. Sethi*,
   848 F. Supp. 2d 439 (S.D.N.Y. 2012)...............................................38, 39

*Vasquez v. Vitamin Shoppe Indus., Inc.*,
   No. 10-CV-8820, 2011 U.S. Dist. LEXIS 74376 (S.D.N.Y. Jul. 11, 2011) ...........24

*Wallace v. Kato*,
   549 U.S. 384 (2007)...........................................................................38

*Yuquilema v. Manhattan's Hero Corp.*,
   No. 13-CV-461 (WHP)(JLC), 2014 U.S. Dist. LEXIS 120422 (S.D.N.Y. Aug.
   26, 2014) .........................................................................................26

*Zerilli-Edelgrass v. N.Y.C. Transit Auth.*,
    333 F.3d 74 (2d Cir. 2003).................................................................................................38

**Statutes**

29 U.S.C. § 203(m)(2)(A)...........................................................................................................24, 25

29 U.S.C. § 206(a)(1)(C) .................................................................................................................5

29 U.S.C. § 216(b) ...................................................................................................................21, 22

29 C.F.R. § 531.59(b) ........................................................................................................ *passim*

## I.      INTRODUCTION

A very recent, closely analogous FLSA tip notice case in Connecticut makes clear that conditional certification should be denied in the instant case. *See Stebbins v. S&P Oyster Co.*, Civil No. 3:16-cv-992(AWT), 2017 U.S. Dist. LEXIS 216367 (D. Conn. Sept. 1, 2017).  In *Stebbins*, Judge Thompson denied FLSA conditional certification because, to determine whether there was an FLSA tip notice violation, the Court "would have to conduct an individualized inquiry with respect to each server to determine what was addressed during his or her training and with respect to any subsequent occasions on which the required information was purportedly verbally conveyed to that server." *Id.* at *11.  The fatal flaw that doomed plaintiffs' conditional certification motion in *Stebbins* also exists here.

Although this Court needs go no further than *Stebbins*, Dakota's opposition seeks to provide this Court with the legal and factual context in an attempt to elucidate an esoteric legal issue that lacks consistency in federal jurisprudence and is made even more confusing because, here, it involves an intersection of federal and Connecticut law.  Plaintiffs' Motion is made pursuant to the FLSA, but Connecticut state law is more protective of employee rights and impacts the relevant policies at Dakota.  For example, Dakota pays its employees the server wage pursuant to Connecticut law (currently $6.38/hour), which is very close to the current *full* minimum wage of the Fair Labor Standards Act ("FLSA") ($7.25/hour).

The purpose of the FLSA is to ensure workers receive a fair day's pay for a fair day's work and are not taken advantage of by employers.  That fair day's pay is the FLSA minimum wage of $7.25 per hour.  This case is attempting to twist the purpose of the FLSA on its head.  Here, servers— who earned more than three times that FLSA minimum wage due to the server wage and tips they earned at Dakota—allege that they should have been paid the full FLSA minimum wage for all those

1

hours and keep their tips.  Plaintiffs' Motion, however, ignores relevant evidence and is based on a hyper-technical (and improper) reading of the FLSA and its regulations.

Plaintiffs' faulty reading of the statutory requirements should be rejected.  Here, Plaintiffs admit they were informed of their server rate, informed of how much in tips they would earn, and informed of what tips they would retain.  In short, Plaintiffs admit they understood how they were compensated at Dakota.  Dakota thus complied with the tip notice provision.  Plaintiffs also admit that they benefited from that compensation system at Dakota.  Indeed, named Plaintiff Taylor, who earned, on average, $30.33 per hour, readily concedes that she would not have worked at Dakota if she made the *Connecticut* minimum wage of $10.10 per hour (i.e., 40% more than the *full* FLSA minimum) and does not believe any server would work at Dakota if they made $10.10 an hour.

Courts have wide discretion to grant or deny collective action notice.  Plaintiffs attempt to rely on inapposite cases in which courts neglected to engage in a careful analysis of the relevant issues on a pre-discovery motion for conditional certification, and instead grant conditional certification motions—some with minimal evidence—and reserve the careful analysis for another day, noting that all the issues can be resolved later after the parties engage in collective discovery.  But, this is no longer a pre-discovery motion.  At the direction of this Court, the parties engaged in the necessary discovery over the past seven months regarding Plaintiffs' Motion, and this Court now has substantial evidence before it that establishes Plaintiffs' Motion should be denied.

The discovery conducted in this case overwhelmingly demonstrates that, on the merits, the named Plaintiffs have no viable FLSA tip notice claim because they had multiple forms of written and oral notice, all of which more than covers (repeatedly) the FLSA tip credit notice requirements under Section 3(m) of the FLSA.  And though not required, Plaintiffs also were informed, both in writing and orally, of the five separate FLSA tip notice requirements of DOL regulation C.F.R. § 531.59(b).  Specifically, Plaintiffs were informed of these compensation issues in a variety of ways,

2

including: the server ad, their interview with managers, the Connecticut labor poster, conversations with managers during orientation and training, and the tip-out procedure with managers at the end of their first shift (and after every shift). On this basis, Plaintiffs' Motion fails.

But this Court does not have to engage in a merits determination to deny Plaintiffs' Motion. Similar to *Stebbins*, Plaintiffs' collective action theory here does not—and cannot—account for the unpredictable human element that alters the conversations between the Dakota managers and employees during the hiring process, orientation, training, tip-out process, and other conversations at Dakota. Specifically, Plaintiffs concede that they have no knowledge of everything said to each Dakota server during (1) their interview, (2) their multi-day orientation, (3) the tip-out procedure at the end of their first shift, (4) the tip-out procedure at every subsequent shift, (5) team meetings attended, or (6) any shift while working at Dakota. Plaintiffs also concede that they cannot account for questions a particular server may have asked that were answered by managers. The Second Circuit is clear that conditional certification is only appropriate if the putative collective were all victims of a common policy or plan that violated the law. There is no such policy or plan here.

The FLSA is not a trap. It is intended to ensure employers are paying their employees a fair wage. That is exactly what occurs at Dakota. Dakota, which is a small business and the only remaining Dakota restaurant in Connecticut, should not be subjected to an in terrorem class and collective action when the evidence before this Court makes clear that there is no common policy or practice that violates the law and individualized issues overwhelm any common claims.

## II.    FACTS

### A. Background on Dakota of Rocky Hill, LLC.

Dakota of Rocky Hill, LLC operates Dakota Steakhouse and Tavern in Rocky Hill, CT ("Dakota" or "the Restaurant"). Although previously there were previously other Dakota restaurants

in the state,[1] the Rocky Hill location is the sole remaining Dakota in Connecticut, and it has survived due in large part to the efforts of long-time restaurant owner, David Melincoff. (*See* Exh. A, Declaration of Joy Benzing, ¶ 3.) Mr. Melincoff is well-regarded by his management team and staff as a fair and caring owner. (*See* Benzing Dec. ¶ 2; Exh. B, Declaration of Kylene Ley, ¶ 3.) This is reflected by the fact that many members of his management team and staff have worked at the Restaurant for many years. (*See* Benzing Dec. ¶ 2; Ley Dec. ¶¶ 2-3.)

**B. Background on Plaintiffs.**

Before starting at Dakota, named Plaintiff Taylor had a lot of experience in the restaurant industry, working at several different restaurants as a server and being paid a server wage plus tips. (Exh. D, Deposition of Rosemarie Taylor 33:6-34:21.) The same is true for named Plaintiff McDougle. Before being hired by Dakota as a server in August of 2015, Plaintiff McDougle had been a server at several other restaurants; at one restaurant he was paid a straight minimum wage but at most restaurants he was paid a subminimum server wage plus tips. (Exh. E, Deposition of Thomas McDougle 15:22-24, 19:19-20:15; 21:3-21; 22:2-24:23; 25:24-27:21.) Plaintiff McDougle also worked as a host at a restaurant, where he received a subminimum wage plus tips. (McDougle Dep. 22:2-20.) At Legal Sea Food, the last restaurant at which Plaintiff McDougle worked prior to working for Dakota, Plaintiff McDougle understood that he was paid a subminimum hourly wage plus tips that would take him above minimum wage. (McDougle Dep. 25:24-27:21.)

---

[1] There used to be two other Dakota Steakhouses in Connecticut, but both restaurants closed. Mr. Melincoff did not have involvement in those two other Dakota Steakhouses when they closed. (Benzing Dec. ¶ 3.)

**C. The Server Position at Dakota.**

**1. In Addition To Tips And Service Charges, Dakota's Servers Are Paid The *Connecticut* Server Tip Credit Wage (currently $6.38), Which Is Slightly Less Than The Full, Non-Server FLSA Minimum Wage Of $7.25.**

The FLSA minimum wage is $7.25 per hour, which is more than three times higher than the FLSA server wage of $2.13 an hour.  29 U.S.C. § 206(a)(1)(C).  However, the Connecticut server wage—and the server wage paid at Dakota—has, at all relevant times, been far higher than the FLSA.  Specifically, Dakota paid servers the following server wage consistent with Connecticut law:  $5.69 in 2014, $5.78 in 2015, $6.07 in 2016, and $6.38 in 2017.  (*See* Exh. F, Compensation Reports; Benzing Dec. ¶ 4.)  The following chart lists the tipped wages in Connecticut (that Dakota servers were paid) and the *full* minimum wage under the FLSA, thereby demonstrating how the higher Connecticut server wage paid is only slightly lower than the FLSA non-server wage:

| Year | *Full* FLSA Minimum Wage (i.e., Non-Tipped Wage) | Connecticut Tipped Wage Paid To Dakota servers | Difference between *full* FLSA Minimum Wage and CT Tipped Wage Paid to Dakota servers |
|---|---|---|---|
| 2014 | $7.25/hr | $5.69/hr | $1.56/hr |
| 2015 | $7.25/hr | $5.78/hr | $1.47/hr |
| 2016 | $7.25/hr | $6.07/hr | $1.18/hr |
| 2017-present | $7.25/hr | $6.38/hr | $0.87/hr |

Put simply, in 2014, a Dakota server would have to earn just $1.56 an hour in tips to have total compensation equal to the FLSA minimum wage.  If a Dakota server worked a thirty hour schedule in a week in 2014, that server would only have to earn approximately *$46.80* in tips ($1.56 an hour * 30 hours) over the course of that *entire* week to earn compensation that equals the full FLSA minimum wage.  And that small amount in tips gets smaller by the year.

As will be noted below, Plaintiff McDougle was informed and understood before starting at Dakota that he would make approximately $20 *per hour* in tips.  (McDougle Dep. 30:21-32:19.) Named Plaintiff Taylor also admits that she learned about how much she could expect to earn in tips by asking her manager. (Taylor Dep. 36:6-37:15.)   The Dakota manager's answer indicated to Plaintiff Taylor that she would earn well over federal and state minimum wage at any given time: Plaintiff Taylor testified that she was told she would earn $100 or $80 a night, (but then subsequently claimed that she could not recall the exact numbers).  (*Id.*)  In short, both named Plaintiffs were informed and understood that they would be making far, far more than the small amount ($1.56 per hour) necessary to cover the FLSA tip credit.  And it is undisputed that they did in fact make well more than the full FLSA minimum wage.  (*See* Exh. F.)

## 2. Dakota's Servers Receive Notice of Their Compensation Structure Through Several Means.

Plaintiffs' brief fails to focus on the whole picture.  That is because that picture unequivocally demonstrates that Dakota's servers receive proper notice of their compensation structure under the FLSA.  Instead, Plaintiffs want the Court to look at each document in the record, and determine that they were not given proper notice because none of those documents individually covers all five points listed in 29 C.F.R. § 531.59(b).  As a preliminary matter, Plaintiffs neglect to mention multiple forms of notice received by Dakota servers that, in total, cover all five points in the DOL regulation.  There is no requirement that restaurants provide servers with a formal written notice (or any written notice) that recites the cryptically worded DOL regulation verbatim, all at the same time.  (*See infra*, p. 26.) The following is the complete picture of how servers at Dakota receive notice of their compensation structure:

**(a) Dakota's Server Advertisements and Written Orientation Materials Inform Servers of Relevant Information About Their Tips and Compensation.**

At the time of hire, Dakota's servers are informed that they will be paid the server minimum wage plus tips through written communications. First, Dakota's postings for open server positions state that servers will be paid the server minimum wage plus tips. (Taylor Dep. 31:18-32:3, and Exh. 4 attached thereto.) Named Plaintiff Taylor admitted that she saw that posting that informed her that her role would be compensated by a server wage plus tips. (*Id.*)

Second, servers receive and complete a New Hire Authorization form, on which their hourly server wage is reflected. (Benzing Dec. ¶ 5.) Named Plaintiff Taylor admitted that she filled out the form and wrote in her hourly server wage on the form. (Taylor Dep. 147:10-19, and Ex. 14 attached thereto.)

Third, servers sign a Tip Reporting Policy form (*See* Exh. G, Tip Reporting Policy Form; Benzing Dec. ¶ 5.) The Tip Reporting Policy notifies servers that they should keep a daily record of their tips, and report them to their employers and on their income tax returns because "all tips received are income." (*See* Exh. G.)

Fourth, servers are provided with an Employee Handbook, which clearly indicates that Dakota takes a tip credit for its servers. For example, in the Handbook that named Plaintiff Taylor produced, Dakota states: "Tip credit will be factored into the hourly rate for tipped employees." (Exh. H, Taylor 000027.) The Handbook further informs servers that "[t]ips must be entered" "at the end of each shift as calculated through the cash out procedure." (Exh. H, Taylor 000035.)

**(b) During Orientation, Servers are Given Oral Notice Regarding Relevant Information About Their Tips and Compensation.**

When a Dakota server is hired, that server attends a multi-day orientation with Dakota managers during which their compensation is discussed (*See* Exh. I, Deposition of Kylene Ley 12:16-23) (testifying that she went through orientation at Dakota led by Marla White in the summer of 2015,

7

and the tip credit was discussed); (Exh, J, Deposition of Joy Benzing 92:12-16, 93:24-94:3) ("I tell them that they get paid whatever server minimum is at the time and tips.").

Named Plaintiff Taylor admitted that she cannot recall everything that was discussed during those meetings.  But Plaintiff Taylor does recall the important information:  she recalls that after orientation was over, she was clear that she was going to be paid a server wage and that she was going to be retaining her tips other than what would be given to the tip pool. (Taylor Dep. 36:6-37:15, 41:22-42:4.)  Plaintiff Taylor conceded that before she started working at Dakota she "felt comfortable and understood" how she was going to be paid.  (Taylor Dep. 44:2-5.)

Likewise, Named Plaintiff McDougle concedes that, when he started at Dakota, he was informed at orientation that he would be making a subminimum server wage plus tips.  (McDougle Dep. 30:3-17.)  The Dakota manager (Marla White) informed Plaintiff McDougle at that orientation that he could expect to earn approximately $600 per week in tips, which would equate to approximately $20 an hour in tips.  (McDougle Dep. 30:17-32:19.)  Such compensation was typical in his experience in the restaurant industry.  (*Id.*)  Plaintiff McDougle also concedes that he was informed by a Dakota manager at orientation that he would retain all of his tips except for a mandatory tip-out to hosts, bussers, and food runners.  (McDougle Dep. 45:5-46:9.)

> **(c) On the First Day (and Every Day) Servers Work, Servers Go Through A "Tip-Out"/"Cash Out" Procedure Where Servers And A Dakota Manager Go Over The Tips That The Server Earned And How Much of Those Tips The Server Will Retain.**

At the end of every shift, servers go through a process at Dakota where they are "cashed out" by a manager.  During this process, the manager goes over the tips the server will retain and how much of those tips will be tipped out to a to a tip pool for hosts, bussers, and food runners.  (Benzing Dec. ¶ 6.)

8

Named Plaintiff Taylor's testimony concedes that on her first at Dakota she understood how her tip retention was going to work, as she was informed which tips she would retain and which tips would be tipped out to a tip pool.  (Tayor Dep. 15:3-19:19.)  Specifically:

Q:      Do you have an understanding of who the tip-out went to?

A:      Yes.  The bartenders and the hosts and the food runners.

Q:      Who told you about the tip-out and who it was going to?

A:      The nightly manager.

Q:      The first time you tipped out you were told that this tip-out is going to go – you were going to retain a portion of your tips, and the rest of the tips are going to go to these other employees?

(Objection omitted)

A:      Yes.  It was going to the other employees.

**Q:      By the first day working at Dakota, you understood how your tip retention was going to work?**

**A:      Yes.**

(Taylor Dep. 19:1-19.)[2]

> #### (d) During Orientation, Servers Have Ample Opportunity to Ask Dakota Managers Questions About Their Compensation That Could Result In Answers Relevant To the FLSA Notice.

In addition to all of these various forms of written and oral notice that Dakota provides to make it crystal clear how a server is going to be paid, Dakota managers are also willing to answer questions a server has about any of these issues.  As noted above, servers attend a multi-day orientation during which their compensation is discussed; servers also end their shift (and every shift) with a process whereby they cash out their tables and go over the tips that they will retain with a Dakota manager.   During this time, a server has ample opportunity to ask the Dakota managers

---

[2] This type of tip-out is valid under the FLSA.  *See Kilgore v. Outback Steakhouse*, 160 F.3d 294, 301-302 (6th Cir. 1998).

questions about their compensation and Dakota's tip policies.  Indeed, the employment handbook that servers are given the first day of work notes on the very first page that employees should "[a]lways feel free to ask any questions [they] may have."  (Exh. H, Taylor 000004.)

Significantly, named Plaintiff Taylor concedes that one of the times she learned about the tip-out requirement and tip pool at Dakota was when she asked Marla White, one of the Dakota managers, about the tip-out either during her interview or at orientation.  (Taylor Dep. 38:1-39:7.)  Ms. White answered named Plaintiff Taylor's questions.  (*Id.*)

Named Plaintiff Taylor also admits that she learned about how much she could expect to earn in tips by asking her manager. (Taylor Dep. 36:6-37:15.)  The Dakota manager's answer indicated to Plaintiff Taylor that she would earn well over federal and state minimum wage at any given time.[3]

Accordingly, between her orientations with the Dakota managers and shadowing other Dakota servers during training, Plaintiff Taylor had a lot of opportunities to ask questions about what she was going to be doing and how she was going to get paid.  Named Plaintiff Taylor has conceded as much. (Taylor Dep. 43:21-44:5.)  And based on those conversations, Plaintiff Taylor concedes that she did not apply to any other restaurants for a server job.  (Taylor Dep. 37:16-37:25.)

### (e) Dakota Wage Statements Clearly List the Server Rates and All The Tips That Are Retained By the Servers.

Even assuming that servers somehow do not understand their compensation structure and even assuming those servers do not ask the managers any questions, servers are reminded yet again of their compensation structure and tips on their first pay stub (and every subsequent pay stub).  The Dakota

---

[3] Plaintiff Taylor testified that she was told she would earn $100 or $80 a night, (but then subsequently claimed that she could not recall the exact numbers).  (*Id.*)  Given that Plaintiff Taylor's longest shift at Dakota was 8.17 hours (Exh. K, Taylor Shift Report), earning $80 a shift in tips would equate to roughly $10 an hour in tips, or about six times more than was necessary to cover the $1.56 per hour gap between the Connecticut cash wage paid ($5.69 per hour in 2014) and the full FLSA minimum wage of $7.25.

10

pay stubs reflect both the amount of tips servers retained as well as their server hourly rate. (Taylor Dep. 26:8:24, Exh. 2 attached thereto.)

Named Plaintiff Taylor conceded that the Dakota wage statement was a clear document that she understood and showed her different rates of pay. (Taylor Dep. 26:8:24, Exh. 2 attached thereto.) Plaintiff McDougle testified that he did not review his paystubs when he received them, because he would throw it away after detaching the check. (McDougle Dep. 49:4-21.) However, when Plaintiff McDougle was shown his paystubs at his deposition, he admitted that he understood the different wage rates and tips. (McDougle Dep. 50:3-52:2, and Exhs. 1 and 3 attached thereto.)

### (f) Servers also attend Periodic Staff Meetings Where Servers are Given Oral Notice Regarding Relevant Information About Their Tips and Compensation.

Servers attend periodic staff meetings during which their compensation is discussed, some of which occurred well before the relevant time period in this lawsuit. (Benzing Dec. ¶ 7; Exh. L, Jan. 12, 2008 Staff Meeting Memorandum Signed by Plaintiff Brancati.) Plaintiffs do not—and cannot—present this Court with any evidence regarding what was said at those staff meetings or what questions servers asked of managers during those staff meetings, or after those staff meetings.

### (g) Clearing Up The Record Regarding Labor Posters: Dakota Prominently Hung The FLSA And Connecticut Labor Posters For The Entire Relevant Time Period.

Dakota has, at all times relevant, hung federal and state labor posters at Dakota in both English and Spanish. (Benzing Dep. 23:19-20, 24:25-25:1, 57:18-60:1; Benzing Dec. ¶ 8; Exh. M, Federal and Connecticut Labor Posters; Exh. N, Declaration of Lenna Noth ¶ 3 and Exh. 1 attached thereto.)[4] The posters are hung in a conspicuous place, i.e., right next to the door through which servers enter and exit Dakota and to the door through which servers enter and exit the supply room. (Benzing Dec.

---

[4] So that the Court can easily read the text of the posters, full size copies will be mailed to the Court with the courtesy copy of this Motion.

¶ 8.)   To the extent this Court still has any doubt about these posters, attached please find evidence of receipts demonstrating that Dakota ordered the posters.  (Noth Dec. ¶ 4 and Exh. 2 attached thereto.)

Plaintiffs wrongly contend that Dakota did not hang any state or federal wage posters until after the lawsuit started, citing Plaintiff McDougle's declaration.  (Dkt. 79-1, p. 16) (citing McDougle Dec. ¶ 27, ECF No. 52-3.)  Yet, Mr. McDougle's declaration does not make this assertion, especially as to the state posters.   Instead, Mr. McDougle's declaration speaks only to the FLSA poster. (McDougle Dec. ¶¶ 21-26.)  Specifically, Plaintiff McDougle alleges definitively only that the FLSA poster was not hung until after the lawsuit.  (McDougle Dec. ¶ 26.)  Putting aside that this allegation about the FLSA poster is not true and Dakota has substantial evidence that this allegation is not true, the important point here is that Plaintiff McDougle does not make a similar allegation regarding the Connecticut labor posters hanging in Dakota.  Instead, Plaintiff McDougle states only that he does not remember seeing any federal or state wage posters at Dakota until after the lawsuit started on February 15, 2017.  (McDougle Decl. ¶ 26.)  That non-committal statement cannot stand for the proposition that Dakota did not hang any state posters.  Indeed, at his deposition, Plaintiff McDougle testified that he did not recall one way or another whether state posters were up.  (McDougle Dep. 62:1-21.)  Plaintiff Taylor also did not recall one way or another whether the state labor poster was up at Dakota.  (Taylor Dep. 45:6-20 and Exh.6 attached thereto.)

### (h) The Connecticut Posters Provide The Relevant Information Required by the DOL's FLSA Tip Notice Rule.

Because Dakota servers are not paid pursuant to the FLSA since the Connecticut server wage is higher, the Connecticut poster is far more informative (and relevant) about the actual compensation structure of the servers. The Connecticut poster at Dakota contains far more detailed information than is required by DOL's FLSA tip notice rule.  Specifically, the Connecticut poster contains information about the full minimum wage:

12

> **Minimum Wage: $8.70 per hour on 1-1-14; $9.15 per hour on 1-1-15; $9.60 per hour on 1-1-16; and $10.10 per hour on 1-1-17** . . . .

The Connecticut poster also contains information about the cash server minimum wage, the tip credit, and the maximum amount the tip credit can be:

> **The amount received in gratuities claimed as credit for part of the minimum fair wage shall be recorded on a weekly basis as a separate item in the wage record . . . Allowances for gratuities as part of the minimum wage shall not exceed 34.6% on January 1, 2014 and 36.8% on January 1, 2015 for employees employed in the hotel and restaurant industry, who customarily receive gratuities . . . .**

The Connecticut poster also contains information that a server cannot be paid a tipped wage unless the specific provisions regarding the tip credit are complied with:

> **Unless otherwise prohibited by statutory provision or by a wage order, gratuities may be recognized as constituting a part of the minimum fair wage when all of the following provisions are complied with . . . .**

Finally, the Connecticut poster repeats the core relevant concepts at the end of the section to make clear to servers how the tip credit works in Connecticut:

> **The wage paid to each employee shall be at least the minimum wage per hour for each hour worked, which may include gratuities not to exceed the limitation herein set forth, provided all conditions herein set forth shall be met**.

(*See* Exh. M, Connecticut Labor Poster)

The last—and only—piece of information that is required by the DOL regulation but is not covered by the Connecticut poster regards the retention of tips. But, as noted above, servers are informed of that information at the end of their first shift—and at the end of every other shift at Dakota—when they tip out. (*See supra*, pp. 8-9.)

### (i)  Starting in February 2017, Dakota Provided Additional Written Notice.

Out of an abundance of caution, since at least February of 2017, Dakota added formalized written notices under Connecticut law and the FLSA that was repetitive of the various forms of written and oral notices that servers already had received. (Benzing Dec. ¶ 9.)

The Connecticut law form informs servers that they must receive gratuities of at least 34.6% of minimum wage of $10.10 per hour and that their guaranteed pay is $6.38 per hour.  (Exh. O, Notice of CT Tip Credit.)  Plaintiffs do not address this Connecticut notice in their motion.  (*See generally* Dkt. 79-1.)

The FLSA form, entitled "Notice of FSLA [sic] Tip Credit," informs servers that: (a) the cash hourly wage paid to tipped employees is no less than $6.38 per hour; (b) Dakota cannot take more than $3.72 as a tip credit; (c) the tip credit cannot exceed the amount of tips received by the server; (d) tips received by the server are to be retained by the server, with the exception of a valid tip pooling arrangement limited to those servers who customarily and regularly receive tips; and (e) the tip credit will not apply to any server who has not received notice of the foregoing provisions. (*See* Exh. O, Notice of FLSA Tip Credit.)  As will be argued below, this *written* notice is not required by the FLSA.[5]

Although Plaintiffs argue that the FLSA notice is defective because it states that the current minimum required cash wage is $5.00 as opposed to $6.38, that typo is located in a parenthetical that is corrected by the rest of the document, not to mention the pay statements each server has that shows they earn $6.38 per hour.  Named Plaintiff McDougle admitted that when he signed the document he knew what the correct server wage was and that he knew $5.00 was a typo.  (McDougle Dep. 248:7-249:3.)

---

[5] This change in policy should not be construed as an admission of liability.  A company's subsequent remedial measures that go *beyond* what the law requires is not relevant to liability.  *See, e.g.*, *Mike v. Safeco Ins. Co. of America*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (concluding that "merits of Mike's claim will turn upon evidence relating to Mike's day-to-day tasks, and not upon any Safeco company policy or decision" to reclassify employees from exempt to non-exempt); *Clarke v. JP Morgan Chase Bank, N.A.*, 08 Civ. 2400(CM)(DCF), 2010 U.S. Dist. LEXIS 33264, at *61 (S.D.N.Y. Mar. 26, 2010) (finding that "the mere fact that an employee was reclassified cannot establish an employer's liability for the period prior to the reclassification").

**D. Plaintiff Taylor Concedes That She—And Other Servers—Would Not Work At Dakota If Servers Made $10.10 Per Hour In Total Compensation, Even Though That Is Approximately 50% More Than FLSA Minimum Wage.**

Plaintiff Taylor conceded that she would not have agreed to become a server at Dakota if she was going to make $10.10 per hour (which is the current Connecticut minimum wage and approximately 40% more than FLSA minimum wage of $7.25). Plaintiff Taylor candidly testified at her deposition on this point:

> Q:   Would you have worked for the restaurant if all you were getting was 10.10 an hour and no tips.
>
> A:   Probably not.
>
> Q:   Because you would have been making less money?
>
> A:   Correct.
>
> Q:   Is it fair to say that the compensation system that was at Dakota where you earned a server wage and you got to keep your tips, you earned a lot more than that, correct?
>
> A:   Than 10.10 an hour?
>
> Q:   Yes.
>
> A:   Yes.
>
> Q:   You benefitted from that compensation system?
>
> A:   Correct.
> . . .
> Q:   Like you said, you wouldn't have worked at Dakota if it was 10.10 an hour and no tips, right?
>
> A:   Correct. I don't think a lot of those servers would.

(Taylor Dep. 144:3-145:9.) Plaintiff Taylor also conceded that "most" restaurants have the same compensation system as the compensation system at Dakota. (Taylor Dep. 145:13-145:25.) When asked whether there were any surprises at Dakota, Plaintiff Taylor's answer did not specify any

surprises regarding the compensation system at Dakota, but instead only regarded the amount of side work done at Dakota.  (Taylor Dep. 145:13-145:25.)

Putting aside that the amount of side work performed at Dakota is no longer at issue in Plaintiffs' Motion, it is worth noting that Plaintiff Taylor worked for Dakota from 2015 until 2018 but admitted that she never looked for another server job at another restaurant.  (Taylor Dep. 146:5-146:16.)

E. **Plaintiffs Have No Evidence Regarding What Others in the Putative Class Were Told About Their Compensation Structure.**

Plaintiffs have filed only one declaration that attempts to speak to the FLSA tip notice issue. That declaration is wholly inadequate.  All named Plaintiff McDougle states is that he does not recall seeing the federal labor poster hung at Dakota's prior to the commencement of this lawsuit. (McDougle Dec. ¶ 27.)  He does not, because he cannot, state what all members of the putative class were told about their compensation structure during their hiring interviews, their orientations, or through questions asked of managers throughout the duration of their employment.  (McDougle Dep. 80:4-18.)  As Plaintiff McDougle testified at his deposition:

> Q:   Fair to say you don't know what Marla said to the other servers in terms of how much they were going to work and what their tips were going to be?
>
> A:   Correct.
>
> Q:   You can't speak to those conversations; correct?
>
> A:   Correct.
>
> Q:   You can't speak to what questions a server might have asked.  Correct?
>
> A:   Correct.

(*Id.*)

Plaintiffs try to patch together a common policy that impacted all approximately 140 servers at Dakota by citing Ms. Benzing's testimony that she instructed Ms. White to conduct orientations in the same manner that she did.  (Dkt. 79-1, p. 12.)  Significantly, Ms. Benzing is not the only manager

who informed Dakota servers about their compensation.  For example, other managers, like Marla White, conducted orientations.  (Benzing Dep. 92:12-93:23.)  Indeed, many servers in the putative collective started at Dakota—and were informed of their compensation—long before Ms. Benzing became general manager at Dakota.  (Benzing Dec. ¶ 10.)[6]  Ms. Benzing's testimony is not evidence that the exact same words were spoken in orientations given by other Dakota managers.  She could not be expected to know what was conveyed or what questions were asked during orientations for which she was not present.

Further, Ms. Benzing's testimony was responsive to questions regarding the *orientation process* (Benzing Dep. 92:12-16, 93:24-94:3), and not the various other points at which Dakota servers are notified of their compensation structure, such as the job interview, or at the cash out process at the end of the first shift and every other shift, or the periodic staff meetings.  At any time, servers could ask managers questions about compensation and tips, and managers would answer those questions.

## III.   PROCEDURAL HISTORY:  THE PRIOR CLASS ACTION LAWSUIT AGAINST DAKOTA AND THE BACKGROUND OF PLAINTIFFS' MOTION

### A.  Dakota was Previously Sued by The Hayber Law Firm In A Class Action Alleging Connecticut Class Claims That Servers Were Improperly Paid The Tip Credit Wage, And The Connecticut Court Denied Class Certification.

It turns out that a very similar lawsuit like this was filed and litigated before.

More than ten years ago, the Hayber Law Firm—the same Plaintiffs' counsel in this action— sued Dakota (and the two other Dakota restaurants in Connecticut that have since closed) in a Connecticut class action lawsuit making similar allegations as are being made in the instant

---

[6] Even if Ms. Benzing's testimony could be used as evidence of what each and every server was told about orientations given by other Dakota managers even before Ms. Benzing became a general manager, all Plaintiffs have established is a putative collective that was adequately given notice of their compensation structure under the FLSA.  As Ms. Benzing testified: "I tell them that they get paid whatever server minimum is at the time and tips. . . . Our goal was to let them know that they weren't getting paid minimum wage and that their tips would more than compensate that gap between what we paid them and, you know, what they made in tips."  (Benzing Dep. 94:2-3, 212:11-18.)

lawsuit.  The prior lawsuit proceeded in the Complex Litigation docket.  *See Galberth v. Dakota*, *et al.*, Dkt. No. HHD-CV-05-4022181s(x03).   The Connecticut Court denied class certification "for the reasons stated in *Orozco v. Darden Restaurants*."   (*See* Exh. P, *Galberth* order denying class certification (Oct. 16, 2006)). The *Orozco* Court, consistent with every other Connecticut court to have examined the relevant issue, found "that extensive individualized inquiries will be necessary to establish both liability and the extent of the harm to each class member, so that common questions of law or fact do not predominate."  *Orozco v. Darden Restaurants, Inc.*, X03CV044022118S, 2006 Conn. Super. LEXIS 2380, at *11 (Conn. Super. Ct. Aug. 3, 2006) (citations omitted).

Having recognized that Plaintiffs' 80/20 claim would likely suffer the same fate, Plaintiffs now focus on their hyper-technical and misplaced notice claim in an attempt to use the FLSA conditional certification procedure to aggregate an ad-hoc Connecticut class. Plaintiffs' counsel has a website that advertises the lawsuit, and nine other servers have already opted into this matter.  (*See* Exh. C, "Dakota's Server Unpaid Wages Lawsuit"; Docket Nos. 9, 12, 23, 24, 27, 40, 41, 42, 76.)  As the law is clear that a Connecticut class is not viable, Plaintiffs' tactic should not be countenanced by this Court as it is contrary to the purpose of the FLSA.  The objective of a collective action is to allow similarly situated individuals to proceed collectively, not to stir up litigation and aggregate as many plaintiffs as possible—whether they are similarly situated or not—in order to force settlement by sheer volume.  *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1752 (2011) ("Other courts have noted the risk of 'in terrorem' settlements that class actions entail.") (citations omitted).

**B. This Court Denied Without Prejudice Plaintiffs' Prior Pre-Discovery Motion for FLSA Conditional Certification, So The Parties Could Engage In Discovery Relevant To Plaintiffs' Motion.**

Almost one year ago, Plaintiffs filed their first FLSA Conditional Certification Motion as a pre-discovery motion.  (Pl's' Motion, Dkt. 52.)  At that time, the parties had engaged in limited discovery and neither party had taken any depositions.  Consequently, Dakota requested an extension

18

with this Court so that Dakota could engage in discovery and conduct the depositions necessary to gather all the evidence for this Court to review. (Def's Motion, Dkt. 55.) This Court held a teleconference with the Parties to discuss the discovery dispute. (Dkt. 69.) The Court ordered that the Parties coordinate a schedule for depositions "necessary to litigate the motion for preliminary class certification," and that the Parties refile briefing on the motion for conditional certification after that discovery concluded. (Dkt. 70.) To preserve the potential claims of the putative collective, this Court ordered that the statute of limitations be tolled until further order of the Court. (Dkt. 70.) This Court then denied Plaintiffs' pre-discovery Motion for Conditional Certification without prejudice to renew following discovery. (Dkt. 77.)

Since this Court's March 26, 2018 order on the discovery dispute (Dkt. 70), the Parties have had approximately seven months to conduct that discovery. During that time, the parties continued to disclose relevant documents (465 pages of documentation have been disclosed by Dakota to date), provided supplemental written discovery responses, and completed the depositions of Joy Benzing and Kylene Ley, both managers at Dakota, and of the named Plaintiffs, Rosemarie Taylor and Thomas McDougle.

It is clear why Plaintiffs rushed to move pre-discovery for conditional certification. Now that discovery has occurred (and in light of the prior lawsuit against Dakota), it is clear that the service work vs. non-service work issue cannot be certified as a Connecticut class and, similarly, the 80/20 FLSA claims cannot be certified as to the putative FLSA collective. Plaintiffs no longer move as to the 80/20 allegations and only move as to the FLSA notice claims. (Dkt. 79-1, p. 2, n. 1.) Moreover, in light of the discovery conducted, it is clear that Plaintiffs' FLSA notice claim is not viable as a collective claim either.

## IV.   LAW AND ARGUMENT

### A.   The Regulatory Purpose of the FLSA is Not Offended by Plaintiffs' Claims In This Case As Plaintiffs Earn Triple, and In Some Cases, Quadruple, The _Federal_ Minimum Hourly Wage.

The Supreme Court and the Second Circuit have "long recognized" that the FLSA's underlying purpose is to "'extend the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.'"  *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015) (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)).  It was "'designed to remedy the evil of overwork by ensuring workers were adequately compensated for long hours . . .'" *Id.* (quoting *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008)).  Accordingly, in certain circumstances, courts have found that the FLSA's regulatory purpose is not offended where the employees at issue earn "well above the federal hourly minimum wage."  *See, e.g.*, *Fernandez v. Zoni Language Ctrs., Inc.*, Docket No. 16-689-cv, 2017 U.S. App. LEXIS 9178, at *51-52 (2d Cir. May 26, 2017); *Monahan v. Cnty of Chesterfield*, 95 F.3d 1263, 1276, n.13 (4th Cir. Sept. 17, 1996)  ("In light of this payment policy, we find it rather petty that part of the basis of Plaintiff Monahan's straight time claim as stated in his affidavit is the County's failure to pay him for the time it takes him to put gas in his patrol car prior to roll call in addition to the time it takes to go to the property room to recover physical evidence prior to court appearances for which the County pays him time and a half to attend. . . .Surely, this is not the evil of overwork and underpay that the FLSA was intended to remedy.").  In other contexts, circuit courts note that the FLSA "must be applied with reason and in a common sense fashion."  *Dunlop v. Ashy*, 555 F.2d 1228, 1234 (5th Cir. 1977) (citations omitted); *Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218 (3d Cir. 1991) (rejecting Plaintiffs' invitation "to adopt a highly technical reading of FLSA in support of a conclusion which flies in the face of common sense, maritime practice, and Congress's intent in passing FLSA").

20

A recent federal court order regarding an analogous tip credit case denied FLSA conditional certification, noting the incongruity of a minimum wage case where the plaintiff always earned more than minimum wage. *See Shala v. Dimora Ristorante, Inc. et. al.*, Civ No. 2:16-03064(WJM), 2016 U.S. Dist. LEXIS 176316, at *7 (D.N.J. Dec. 21, 2016) ("[T]he evidence also casts doubt on the existence of a policy in violation of the FLSA that affected Plaintiff himself: the tip distribution sheet Plaintiff attaches appears to indicate that Plaintiff earned a total of $1,027 in tips for the week of April 25, 2016. Even assuming that Plaintiff worked 60 hours that week, he was paid an average of $17 an hour for that time.").

This is not a case where an overbearing employer is seeking to take advantage of its employees. Plaintiffs earn triple, and in some cases, quadruple, the minimum federal hourly wage. (*See* Exh. F.) The compensation system at Dakota ensured servers earned a fair day's pay that was well above the federal hourly minimum wage. (*See* Exh. F.) Plaintiff Taylor concedes that she and other servers would not work at Dakota if they made only $10.10 per hour. (Taylor Dep. 144:3-145:9.) Moreover, Plaintiffs were informed and understood the compensation system at Dakota. (*See supra*, pp. 7-9, 11.)

## B. FLSA Conditional Certification Standard: Plaintiffs Cannot Meet Their Burden To Certify A Collective Under A Heightened Standard Or The Conditional Certification Standard Articulated In *Glatt*.

Under the FLSA, a collective action for unpaid wages may be maintained "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Conditional certification is only appropriate if a plaintiff makes a "factual showing that [they] and potential opt-in plaintiffs together were victims of a ***common policy or plan that violated the law***." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (emphasis added) (internal citations and quotations omitted); *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 539-40 (2d Cir. 2016) (vacating district court's FLSA's conditional certification order "under the minimal pre-

21

discovery standard"). The Court's role at this stage requires screening unmanageable or judicially inefficient classes. *See Hoffmann-La Roche Inc. v. Sperling.*, 493 U.S. 165, 170 (1989) (noting that § 216(b) is based on a theory of judicial economy, under which "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity").

As noted below, because the Parties completed substantial discovery on the FLSA notice issue, this Court should apply a heightened standard of review. However, even if this Court does not apply a heightened standard of review, the Second Circuit makes clear that conditional certification is inappropriate even under the lenient pre-discovery standard.

## 1. This Court Should Apply A Heightened Standard Of Review Because The Parties Completed Substantial Discovery On The FLSA Notice Issue.

When a case has been pending and discovery has occurred, courts can apply a heightened intermediate standard. For example, the Honorable Michael P. Shea has acknowledged using a higher, "intermediate" approach on a motion for FLSA conditional certification when discovery has occurred. *See Rosario v. Compass Grp., USA, Inc.*, No. 3:15-CV-00241, 2016 U.S. Dist. LEXIS 14078, at *12 (D. Conn. 2016) (acknowledging use of an "intermediate" approach in another case when discovery has occurred but declining to use it in *Rosario* because motion failed under lenient standard).[7] "The rationale [for the lenient standard] disappears . . . once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004).

---

[7] *See also Hendricks v. J.P. Morgan Chase Bank*, 263 F.R.D. 78, 83 (D. Conn. 2009) ("JPMorgan argues that, because of the extensive discovery that has already taken place in this case, the court should assess plaintiffs' motion as if it were at the second step. The court agrees that it should determine whether to certify this collection action based on the full evidence before it, rather than merely examining the 'pleadings and affidavits,' as courts do at the first step."); *Amendola v. Bristol-Meyers Squibb Co.*, 558 F. Supp. 2d 459, 467 n.9 (S.D.N.Y 2008) ("scrutiniz[ing] the merits" and denying certification "based on the record developed" during pre-certification discovery); *Bunyan v. Spectrum Brands, Inc.*, Case No. 07-CV-0089-MJR, 2008 U.S. Dist. LEXIS 59278, at *8 (S.D. Ill. July 31, 2008) ("Courts also recognize that once substantial discovery has been conducted, plaintiffs face a higher burden in proving that they and potential class members are similarly situated.").

22

Although Plaintiffs continue to argue for the low, pre-discovery standard, that standard should not apply since significant discovery has now occurred regarding the FLSA notice issue and Plaintiffs had ample opportunity to conduct that discovery.  (*See supra*, p. 19.)  This Court made clear that the Parties were to conduct the depositions necessary to litigate Plaintiffs' Motion for Conditional Certification.  (Dkt. 70.)  Consequently, this Court should apply a heightened standard of review to Plaintiffs' motion.

Dakota notes that, in *Glatt*, the Second Circuit did not opine on whether a heightened standard is appropriate even though the issue was raised, because, as noted in the section below, the Second Circuit held that the plaintiffs failed to meet the burden for conditional certification under the lenient, first stage standard.  *See Glatt*, 811 F.3d at 539-40.

### 2. Even If This Court Does Not Apply A Heightened Standard, The Second Circuit's Recent *Glatt* Decision Makes Clear That Conditional Certification Is Inappropriate Under the Lenient Pre-Discovery Standard.

The Second Circuit recently made clear that cases with individualized determinations as to liability should not proceed as a collective action even "under the minimal pre-discovery standard". *See Glatt*, 811 F.3d 528, 539-40.  In *Glatt*, a case that considered whether a group of interns could commonly pursue their claim to be "employees", the Second Circuit vacated the district court's order conditionally certifying the FLSA collective because "the common proof identified [by the plaintiff], and relied on by the district court, addresses only some of the relevant factors," thereby requiring consideration of the individual aspects of the intern's experience. *Id*.  The court reached this conclusion even though plaintiffs pointed to (and the district court relied upon) common evidence that was "relevant" to the issue of whether the intern was an employee, but ultimately did not answer the question, leaving the most important question unable to be answered with common proof.  *See id*. Thus, under *Glatt*, in cases, like here, where the plaintiff's claim requires consideration of individual aspects of the employee's experience to determine liability, conditional certification is not

23

appropriate. *See id; see also Rosario*, 2016 U.S. Dist. LEXIS 14078, at *5, *10-11 (citing *Glatt* and

denying FLSA conditional certification motion).

Even before *Glatt*, conditional certification was "not automatic." *Vasquez v. Vitamin Shoppe*

*Indus., Inc.*, No. 10-CV-8820, 2011 U.S. Dist. LEXIS 74376, at *9 (S.D.N.Y. Jul. 11, 2011). Courts

"must . . . take a measured approach when addressing a request for collective action certification,

mindful of the potential burdens associated with defending against an FLSA claim involving a large

and broadly defined collective group of plaintiffs." *Rudd v. T.L. Cannon Corp.*, No. 3:10-CV-

0591(TJM)(DEP), 2011 U.S. Dist. LEXIS 21061, at *17 (N.D.N.Y. Jan. 4, 2011), *adopted by*, 2011

U.S. Dist. LEXIS 20968 (N.D.N.Y. Mar. 3, 2011).

Here, Plaintiffs' notice claim fails because: (1) the named plaintiffs had multiple forms of

written and oral notice, all of which more than covers (repeatedly) the FLSA tip credit notice

requirements; and (2) determination of any liability in this matter would require individualized

assessments of hundreds of different conversations between servers and managers, and such a

situation is inappropriate for collective treatment.

**C. Plaintiffs Have No Viable FLSA Notice Claim Because Plaintiffs (And All Servers) Had Multiple Forms Of Written And Oral Notice, All Of Which More Than Covers (Repeatedly) The FLSA Tip Credit Notice Requirements.**

As a preliminary matter, the specific compensation terms that are required by the FLSA are

largely irrelevant to the servers at Dakota since Connecticut law has a higher minimum wage and a

higher tip credit cash wage. In other words, the Dakota servers are not paid pursuant to the FLSA tip

credit but pursuant to the Connecticut tip credit.

In any event, the statute of the FLSA is clear about the notice that must be given to an

employee in order to take a tip credit under the FLSA. *See* 29 U.S.C. § 203(m)(2)(A) (note, that this

statute is often referred to as Section 3(m)). Specifically, the statute directs that for an employer to

use the tip credit it must: (1) "inform" the employee of their server cash wage amount, (2) "inform"

the employee that they will make tips that will amount to a combined wage that is equal or more than

minimum wage (which is currently $7.25 per hour), and (3) "allow" the employee to retain all tips

except for tips that are used in tip pools among employees who customarily and regularly receive tips.

*See* 29 U.S.C. § 203(m)(2)(A).

Even though Section 3(m) of the FLSA is clear and unambiguous regarding what notice an

employer must give to its employees, DOL recently published C.F.R. § 531.59(b), which goes beyond

the statute and requires notice of five separate issues regarding the FLSA tip credit.  *See* C.F.R. §

531.59(b).  Specifically, the regulation requires that, for an employer to use the tip credit, it must

"inform[]" the employee: (1) the amount of cash wage the employer is paying a tipped employee, (2)

the additional amount claimed by the employer as a tip credit, (3) the tip credit claimed by the

employer cannot exceed the amount of tips actually received by the tipped employee, (4) all tips

received by the tipped employee are to be retained by the employee except for a valid tip pooling

arrangement limited to employees who customarily and regularly receive tips, and (5) the tip credit

will not apply to any tipped employee unless the employee has been informed of these tip credit

provisions.  *See* C.F.R. § 531.59(b).[8]

Notably, both the FLSA statute and DOL regulation use the word "inform" as opposed to

"explain," thereby making clear that employers do not have to engage in an exhaustive effort (or any

effort at all) to explain any of these concepts and employees do not even have to understand any of

the requirements.  All that is required is that employers inform employees.  Moreover, nothing in the

statute or DOL's regulation specifies how employers inform their employees of these requirements.

---

[8] This new DOL regulation became effective May 5, 2011.  At the same time, DOL changed its regulation regarding the
service advisor exemption.  The Supreme Court found DOL's 2011 final rule regarding the service advisors exemption
to be an "arbitrary and capricious regulation . . . unlawful and receives no *Chevron* deference" because DOL failed to
give "adequate reasons" for its decision, failed to "examine the relevant data," failed to articulate a "satisfactory" or
"reasoned" explanation for its action, and failed to "include[e] a rational connection between the facts found and the
choice made."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  The same is true of the new tip notice
regulation.  Although this issue does not need to be decided by this Court on this Motion, if and when C.F.R. § 531.59(b)
is examined by the Supreme Court, it will likely suffer the same fate.

Finally, nothing in the statute or DOL's regulation requires that employees be informed of all these requirements at the same time as opposed to being informed of these requirements at various times when it makes the most practical sense (e.g., explaining the retention of tips and tip pooling during the tip out procedure).

As noted in detail below, many federal courts take a practical and commonsense approach to the FLSA tip credit notice requirements and find that employers can use the FLSA tip credit so long as the employer advises its employees that they will receive a server wage plus a tip amount that equals FLSA minimum wage or higher, and the employees do receive such compensation. No rigorous explanation of the tip credit is required. If this Court agrees with these courts as to the tip notice requirements, then even Plaintiffs concede in their motion that Dakota satisfied its obligations under the FLSA. However, even assuming the FLSA requires that servers must be informed of all five points in the DOL regulation, the undisputed evidence establishes that Dakota informed the named plaintiffs (and all the servers) of all five points.

1. **Many Courts Take A Practical And Commonsense Approach To The Tip Credit Notice Requirements And Find That Employers Can Use The Tip Credit Even If They Do Not Engage In A Rigorous Explanation Of The Tip Credit With Employees.**

Contrary to the suggestion in Plaintiffs' memorandum, the law is clear that formal, written notice of the FLSA tip credit is not required. *See Pellon v. Bus. Representation Int'l Inc.*, 528 F. Supp. 2d 1306, 1311-12 (S.D. Fla. 2007), *aff'd* 2008 U.S. App. LEXIS 19077 (11th Cir. Sept. 3, 2008); *see also Yuquilema v. Manhattan's Hero Corp.*, No. 13-CV-461 (WHP)(JLC), 2014 U.S. Dist. LEXIS 120422, at *11 n.6 (S.D.N.Y. Aug. 26, 2014) (stating that an employer may inform "the employee either orally or in writing about his intent to apply this tip credit and permitting the employee to retain all of the tips"). Plaintiffs attempt to portray a dim picture of federal jurisprudence regarding the legal consequences related to the FLSA tip notice, wrongly suggesting "[f]our circuit courts and several district courts" take a hyper-technical view of FLSA tip notice requirements. (Dkt.

79-1, pp. 5-7) (citing cases).  Putting aside that the cited cases are distinguishable, the four circuit court cases—all of which are outside the Second Circuit—do not make any such hyper-technical proclamation regarding the FLSA tip notice.[9]

Indeed, courts recognize that "the FLSA does not require a rigorous explanation to employees about how the tip credit works" but only that they are, orally or in writing, "advised and receive a wage plus tip amount equal to minimum wage or higher." *Pellon*, 528 F. Supp. 2d at 1312.  *See also Ide v. Neighborhood Restaurant Partners, LLC*, 32 F. Supp. 3d 1285, 1290 (N.D. Ga. 2014) ("the undersigned determines that the Wage and Hour Poster properly informed Defendants' tip credit employees of the tip credit exemption"), *aff'd*, 667 Fed. Appx. 746 (11th Cir. 2016).  Under such a practical interpretation of tip credit notice law, there is no dispute that Plaintiffs were informed of the FLSA tip credit and have no claims.  Notably, this practical approach is consistent with other areas in which there is a notice requirement for employees.  For example, in the context of the Family and Medical Leave Act, which borrows its remedial scheme from the FLSA, courts hold that technical violations of the notice requirement are not actionable.[10]

---

[9] *See Pellon*, 528 F. Supp. 2d at 1311-12 (distinguishing the circuit court cases cited in Plaintiffs' Motion from facts similar to those presented here). For example, in *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322-23 (1st Cir. 1992), there was testimony from eight waiters that their employer told them absolutely nothing at all about their hourly wage or tips, and that "no one [among the waiters] even knew what a tip credit meant"). That is clearly not the case here. (*See supra*, pp. 7-16.)  In light of the outright failure to provide any notice of the tip credit, the *Pellon* Court stated: "To the extent that the *Martin* Court discusses what would be required if there had been any notice whatsoever, this Court cannot say with certainty how the *Martin* court would have ruled." *Pellon*, 528 F. Supp. 2d at 1312.  And, in *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979), the parties had stipulated that servers were never informed of the tip credit.  That is certainly not the case here. Moreover, *Pellon* expressly rejected the contention in *Bonham v. Copper Cellar Corp.*, 476 F. Supp. 98, 101-102 (E.D. Tenn. 1979), that an employer must "explain" the provisions of section 3(m) to its employees.  *See Pellon*, 528 F. Supp. 2d at 1310 ("Employers do not have to 'explain' the tip credit to employees, however; it is enough to 'inform' them of it. . . To 'inform' an employee requires less effort than it would to 'explain' the tip credit to the employees.").  *Bonham* is further distinguishable because the labor law poster at issue in that case was not prominently displayed and did not contain all relevant information.  *See Bonham*, 476 F. Supp. at 101-02. The fact that the Court took the time to analyze the poster, however, demonstrates that labor posters can satisfy FLSA's tip notice requirement. *See Kilgore*, 160 F.3d at 299 ("Had the poster's content been introduced into evidence, and had it been prominently displayed, then Subsection (m)'s notice requirement would have been satisfied. Otherwise, the *Bonham* Court's discussion of these failings would have been pointless.").

[10] *See, e.g., Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 18 (D. Conn. 2016) ("To establish an interference claim based on failure to give notice [of FMLA rights], a plaintiff must show impairment of [her] rights and resulting prejudice.

To be fair, however, federal case law on this FLSA tip notice issue is not consistent, and that lack of consistency confuses and complicates the issue. As Plaintiffs allege, some courts take a hyper-technical view of the issue (although not nearly as hyper-technical as Plaintiffs will have this Court believe). Some district courts that take a more hyper-technical view often do so in the face of bad facts—that do not exist here in the instant case—that demonstrate that the employee servers got zero notice of how they were compensated, were improperly paid overtime, or did not receive tips in the amounts of the Dakota servers.[11] As Dakota established above, however, other courts take a broad, practical view of the issue. And still others take a middle ground approach. The Second Circuit has yet to opine on the FLSA tip notice requirements.

In any event, to the extent any general middle-ground principle can be gleaned from the inconsistent federal case law on the FLSA tip notice issue, it can probably be summarized as articulated by *Hernandez v. Jrpac Inc.*, 14 Civ. 4176(PAE), 2016 U.S. Dist. LEXIS 75430, at *74-75 (S.D.N.Y. June 9, 2016), which is a case cited by Plaintiffs. (Dkt. 79-1, p. 5.) The *Hernandez* court examined extensive federal law on this issue and stated that "[c]ourts in and outside of this District have interpreted the notice provision to require at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations." *Id.* (quotations omitted; citing, among other cases, *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322-23 (1st Cir. 1992); *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998); *Reich v. Chez Robert, Inc.*, 28 F.3d 401, 404 (3d Cir. 1994)). The *Hernandez* Court went on to state: "An employer gives sufficient notice if, for example, it gives employees a copy of § 203(m) [also called 3(m)] and informs them that their tips will be used as a credit against the minimum wage as permitted by law."

---

. . Hewett has failed to present evidence that she would have materially changed her conduct in any way if her leave had been classified under FMLA.") (internal citations and quotations omitted).

[11] The following are just two examples of such cases cited by Plaintiffs. *See, e.g.*, *Bittencourt v. Ferrera Bakry & Café, Inc.*, 310 F.R.D. 106 (S.D.N.Y. 2015) (also pre-*Glatt*).

*Id.* (quotations and citations omitted).  Further, "[e]mployers do not have to 'explain' the tip credit to employees, however; it is enough to 'inform' them of it." *Id.* (quotations and citations omitted). Finally, the *Hernandez* court noted that "[t]he FLSA's notice provision does not require that the notice be given in writing." *Id.* (citations omitted).

In their instant motion, Plaintiffs here concede—as they must—that Dakota satisfied the FLSA tip notice requirement as articulated by *Hernandez.* (Dkt. 79-1, p. 13.)  Specifically, Plaintiffs concede that Ms. Benzing, the general manager of Dakota, told servers about their server compensation and that they would get paid the server minimum plus tips.  (Dkt. 79-1, p. 13 (citing Benzing Dep. 92-12-93:7, 93:24-94:3, 212:15-18.)  Plaintiffs also concede that Ms. Benzing's goal when explaining that compensation was to inform the servers that they would not be getting paid minimum wage but their tips would more than compensate the gap between that server wage and what the server would make in tips.  (Dkt. 79-1, p. 13) (citing Benzing Dep. 212:15-18.)  *That* is an explanation—in understandable plain English—of what the tip credit is and how it applies to the servers.  It is far easier for a layperson, who never went to law school, to understand Ms. Benzing's explanation of the tip credit than the actual wording of Section 3(m).

Plaintiffs attempt to make a big deal out of fact that Ms. Benzing testified that she did not use the specific phrase "tip credit" during orientation.  (Dkt. 79-1, p. 19.)  As an initial matter, the evidence before this Court demonstrates that some managers at Dakota did use the term "tip credit" when explaining the compensation system to putative collective members.  (Ley Dep. 12:16-23) (testifying that another Dakota manager mentioned "tip credit" to her during server orientation.)[12]   However,

---

[12] Plaintiffs state that Ms. Ley did not provide any details in her deposition about what was said about the "tip credit." (Dkt. 79-1, p. 19, fn. 12.)  That is because she was not asked for any details.  Once Ms. Ley mentioned that she was told about the tip credit, Plaintiffs' counsel immediately shifted focus:
    Q. And did you go through any type of orientation?
    A. Yes.
    Q. Tell me about that.
    A. We went over the food.  We went through the employee handbook.  We talked about what I'd be making. She mentioned the tip credit, all of that orientation stuff.

even assuming Ms. Benzing was the only manager at Dakota and even assuming Ms. Benzing never said the words "tip credit" to the servers she managed, Ms. Benzing does not need to say the phrase "tip credit" to inform the servers of the tip credit.  Indeed, her explanation clearly informed the servers of the tip credit by informing them that their tips would compensate them for the gap between their subminimum wage and minimum wage.  Using the term "tip credit" would have done nothing more than created a circular definition of the term "tip credit" where the term being defined was part of the definition.  Put another way, even assuming the servers were not familiar with the term "tip credit," the servers were informed, and even understood, their compensation system, which included a tip credit.

Ms. Benzing's approach made sense for two important reasons.  First, had Ms. Benzing informed Plaintiffs about what was required for the FLSA tip credit, it would not have been helpful information.  As noted above, in 2014, a server at Dakota had to earn just $1.56 an hour in tips (or $46.80 for an entire week of work assuming a 30 hour schedule) to cover the FLSA tip credit gap.  But Plaintiff Taylor testified that she would never have worked at Dakota if she was making the regular minimum of $10.10 per hour, let alone $7.25 per hour.  The relevant information that the Dakota managers provided to Plaintiffs was that their subminimum wage and estimated tips would total far more than the FLSA gap of $1.56 per hour.  Specifically, Plaintiffs understood they would be making approximately $20 per hour in tips.  Notably, there was never a week that either named Plaintiff Taylor or McDougle earned less than $7.25 per hour or even close to it.  In fact, the lowest hourly wage that named Plaintiff Taylor earned in any one week was $17.90.  (*See* Exh. F, Def's 000406-000410.)  The lowest hourly wage that named Plaintiff McDougle ever earned in one week

---

Q. Were there any documents that you were given or signed?
(Ley Dep. 12:16-25.)

was $17.48.  (*See id.*, Def's 000386-000390.)  Because Dakota is a nice restaurant where servers earn substantial tips, there was never a week where Dakota had to make up the difference between the subminimum Connecticut server wage earned and the full FLSA minimum wage for Plaintiffs.

Second, the evidence in the record demonstrates that, had Ms. Benzing informed the servers of the tip credit issues by merely citing verbatim the FLSA statute or cryptic DOL regulation, the servers would not have understood what she was talking about.  Indeed, named Plaintiff Taylor testified at her deposition that she still does not understand what the phrase "tip credit" means. (Taylor Dep. 131:19-132:6.)  This is notable because, at the time of her deposition, Plaintiff Taylor had (1) signed the Connecticut tip credit statement, (2) signed the FLSA tip notice statement that contained all the information that is required in the DOL regulation, and (3) met with her attorney who explained the tip credit to her.  (Taylor Dep. 131:19-131:25; Exh. O.)  Even after all that, she still did not have an understanding of the technical definition—or any definition—of the term "tip credit".  (Taylor Dep. 131:19-132:6.)

Put another way, Plaintiff Taylor did not understand the legal definition of the tip credit, but she clearly understood the practical definition of a tip credit, specifically that she would be paid less than minimum wage and retain tips in addition to that wage that would result in total compensation far more than Connecticut minimum wage (and even higher than FLSA minimum wage).  Because of the various ways that Dakota conveyed to its employees how they would be paid (the server advertisement, the job interviews, the New Hire Authorization Form, the Handbook, the Tip Reporting Policy, orientations, staff meetings, the nightly cash out procedure, etc.), both Plaintiff McDougle and Plaintiff Taylor acknowledged that they knew how much they would be paid hourly, had a rough estimate of how much they would make in tips (that was far more than $1.56 per hour), knew how much of their tips they would retain each shift, and knew how much of their tips would be contributed to a tip pool.  (*See supra*, pp. 7-15.)  Once again, Plaintiffs' admissions confirm that they

were informed, in plain English, of all the requirements of Section 3(m) and DOL regulation C.F.R.

§ 531.59(b).

Consequently, the evidence establishes that Plaintiffs (and other servers) are informed of the

FLSA tip notice requirements.

### 2. Dakota's Connecticut Labor Poster Is Sufficient To Inform The Servers Of The Tip Credit Under Section 3(m) Of The FLSA And, At Minimum, Four Of The Five Requirements Under The DOL Regulation.

"[S]everal courts have found that a minimum wage poster such as the one [required by the

Department of Labor] satisfies the notice requirement for taking a tip credit under the FLSA, provided

it is prominently displayed." *Porter v. West Side Rest., LLC*, Case No. 13-1112-JAR-KGG, 2014

U.S. Dist. LEXIS 57126, at *25 (D. Kan. Apr. 24, 2014) (citing *Torres v. Cache Cache, Ltd.*, No. 12-

cv-00150, 2013 U.S. Dist. LEXIS 55687, at *10 (D. Colo. Apr. 18, 2013); *see also Ide*, 32 F. Supp.

3d 1285, 1290 ("the undersigned determines that the Wage and Hour Poster properly informed

Defendants' tip credit employees of the tip credit exemption"), *aff'd*, 667 Fed. Appx. 746 (11th Cir.

2016); *Davis v. B&B Inc.*, 38 F. Supp. 2d 707, 719 (N.D. Ind. 1998) (collecting cases); *Dominguez v.

Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 822 (N.D. Ill. 2011)) ("An employer can also convey

notice by way of a prominently displayed poster containing information about the tip credit

provision."); *see also Garcia v. Palomino*, 738 F. Supp. 2d 1171, 1178 (D. Kan. Sept. 7, 2010)

(denying the plaintiffs' summary judgment motion and stating: "[Defendants] did hang up a poster

discussing the minimum wage laws in an area that Plaintiffs routinely frequented. Furthermore,

Defendants told Plaintiffs that they would make only $2.30/hr and Plaintiffs' pay stubs reflected this

fact. Based on these facts, the Court finds that a reasonable jury could conclude that Defendants

informed Plaintiffs of their intent to treat tips as satisfying part of their minimum wage obligations.").

Dakota has at all times had the Connecticut labor poster prominently hanging in a conspicuous place in the Restaurant.  (Benzing Dec. ¶ 8; Exh. M, Taylor Dep., Exh. 6.)[13]  Dakota's evidence that the Connecticut poster was prominently displayed is sufficient for this Court to conclude that Plaintiffs were "informed" of its contents, even if Plaintiffs lack any recollection of seeing the poster.  *See Pellon*, 528 F. Supp. 2d at 1311 ("[A] witness' statement that he "does not recall" information contained in a poster is insufficient to refute record evidence unequivocally establishing the matter.") (citing *Posey v. Skyline Corp.*, 702 F.2d 102, 105–06 (7th Cir.1983); *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049-50 (4th Cir.1987)).

Consequently, Dakota's evidence that it hung the Connecticut labor poster is dispositive of Plaintiffs' entire FLSA tip notice claim.  Even Plaintiffs seem to concede that the labor posters are sufficient.[14]  Alternatively, as argued in the next subsection, the poster is dispositive that servers were informed of four of the five requirements from the DOL regulation.

### 3.  Even Assuming The FLSA Requires That Servers Must Be Informed Of All Five Points In The DOL Regulation, Dakota Did Inform The Servers Of All Five Points.

The Second Circuit has not yet opined on how an employer can satisfy the five points from C.F.R. § 531.59(b).  DOL guidance makes clear that formal, written notice is not required for compliance with the five points from C.F.R. § 531.59(b).  *See* <u>Fact Sheet #15</u>, U.S. Dep't of Labor, <u>https://www.dol.gov/whd/regs/compliance/whdfs15.htm</u> (last visited November 2, 2018) ("The

---

[13] To be clear, Dakota is not conceding that the FLSA poster was not also hung for the relevant time period.  It was.  But, Dakota relies on the Connecticut poster because (1) there is no dispute regarding the Connecticut poster, (2) the Connecticut poster is more detailed and relevant to how the servers are compensated at Dakota since servers are paid pursuant to Connecticut law, and (3) the Connecticut poster addresses the same topics as DOL's federal poster.  Presumably the DOL poster is sufficient notice because DOL created C.F.R. § 531.59(b) *and* drafts the labor poster language.

[14] In their proposed Notice of Pending Collective Action, Plaintiffs describe their FLSA notice claim as follows: "Federal law requires that restaurants put up wage posters that explain servers' rights under federal minimum wage laws.  Restaurants cannot take a tip credit against a server's wages if they do not put up these posters.  Mr. McDougle and Ms. Taylor claim that Dakota did not put up these wage posters before taking the "tip credit" against their serving wages in violation of federal law."  (Docket Entry No. 52-8, p. 2.)

33

employer may provide oral or written notice to its tipped employees."). Even assuming this Court takes a hyper-technical approach to FLSA tip credit notice and requires that Dakota "inform" its servers of all five points in DOL regulation C.F.R. § 531.59(b), Plaintiffs' Motion *still* fails because Dakota repeatedly informs the Dakota servers of all five points through oral and written notice. (*See supra*, pp. 7-15.)

For example, the Connecticut Labor Poster, which Plaintiffs have no evidence was not hung at Dakota throughout the relevant time period, "informs" Dakota's servers of four of the five points from C.F.R. § 531.59(b). (*See* Exh. M, *supra*, pp. 12-13.) The fifth and final point is covered *every single day* by the manager conducting the cash out process when the manager "informs" the servers of the amount of tips the server will retain and the amount that is tipped out to a tip pool of hosts, bussers, and food runners. (*See supra*, pp. 8-9.) In addition to the poster and the cash out process, there is significant evidence before this Court that Dakota—through other various forms of written and oral notice that Plaintiffs concede were given—repeatedly cover the five points from C.F.R. § 531.59(b). (*See supra*, pp. 7-15.) There is no violation here. And, thus, no reason to conditionally certify a collective.

*       *       *

Although courts very rarely make merits determinations on conditional certification, Dakota presented the merits of the tip notice claim so that this Court would have the relevant statutory, regulatory, and factual background. This Court, however, does not have to make any merits determination to deny conditional certification. The following section, which is the crux of Dakota's conditional certification arguments, makes clear that conditional certification should be denied.

34

**D. Even Assuming This Court Finds That Servers Must Be Informed Of All Five Points In The DOL Regulation, And Even Assuming This Court Does Not Make A Merits Determination, This Court Should *Still* Deny Conditional Certification Because Individualized Inquiries Are Necessary To Determine What Each Server Was Told Regarding His/Her Compensation.**

The Second Circuit is clear that conditional certification is only appropriate if the putative collective "were victims of a common policy or plan that violated the law." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (internal citations and quotations omitted); *Glatt*, 811 F.3d 528, 539-40.  Dakota is not attempting to perpetrate a subterfuge where it hides from the servers the manner in which they are paid. *That* would be a common unlawful policy.  But that is not happening at Dakota.  Dakota— through oral and written communications—informs servers repeatedly how they will be paid, what the tipping policy is, and what tips servers retain.

In a recent, closely analogous FLSA tip credit case, the Honorable Alvin W. Thompson denied FLSA conditional certification under the lenient pre-discovery standard because, like here, to determine whether there was an FLSA tip notice violation, the Court "would have to conduct an individualized inquiry with respect to each server to determine what was addressed during his or her training and with respect to any subsequent occasions on which the required information was purportedly verbally conveyed to that server."  *Stebbins v. S&P Oyster Co.*, Civil No. 3:16-cv-992(AWT), 2017 U.S. Dist. LEXIS 216367, at *11 (D. Conn. Sept. 1, 2017).

Similar to the situation in *Stebbins*, Plaintiffs' collective action theory here does not—and cannot—account for the unpredictable human element that alters the conversations between the Dakota managers and employees during the hiring process, orientation, training, tip-out process and other conversations at Dakota.  For example, Plaintiffs' theory does not account for the evidence that some Dakota servers were informed by Dakota managers of the tip credit using the technical "tip credit" term.  (Ley Dep. 12:16-23.)

Plaintiffs' theory also does not account for whether any Dakota server asked a specific question about why they were paid a server wage. For example, Plaintiff Taylor concedes that she learned about the tip-out requirement and tip pool at Dakota after asking a Dakota manager a question about the tip-out.  (Taylor Dep. 38:1-39:7.)  In addition, Plaintiff McDougle testified that he never looked at his wage statements that showed (1) his server wage, (2) his full minimum wage when he earned the full Connecticut minimum wage, and (3) his retained tips that clearly show he earned more than the FLSA minimum wage and Connecticut minimum wage. (McDougle Dep. 49:4-21, Exhs. 1 and 3 attached thereto.) What if another Dakota server *did* look at those wage statements and asked a Dakota manager questions that elicited answers that conveyed the tip notice requirements?  Or asked questions at any number of subsequent occasions, like the nightly cash out procedure, that elicited answers that conveyed the tip notice requirements?  Judge Thompson correctly concluded in *Stebbins* that these "subsequent occasions" doom conditional certification.  *See Stebbins*, 2017 U.S. Dist. LEXIS 216367, at *11.  That same fatal flaw exists here.

Here, Plaintiffs do not—and cannot—allege to have knowledge of what was said to each server during (1) their interview, (2) their multi-day orientation, (3) the tip-out procedure at the end of their first shift, (4) the tip-out procedure during every subsequent shift, (5) team meetings attended, or (6) any shift while working at Dakota.  Although Plaintiff McDougle states in his declaration that "Dakota does not inform us of the information in paragraphs 22-24 in any other way," he has no basis to make this statement on behalf of all 140 putative class members, and has conceded as much. (*See* McDougle Dec. ¶ 22-25; McDougle Dep. 80:1-8.)

Though they try to do so in their Motion (Dkt. 79-1, pp. 10-11), Plaintiffs cannot distinguish *Stebbins* from the instant matter.  The plaintiffs in *Stebbins* provided two declarations (more than Plaintiffs in this case) from servers stating that they were not provided the requisite information for S&P to take the tip credit.  *See Stebbins*, 2017 U.S. Dist. LEXIS 216367, at *10. Those declarations

36

went far beyond what Plaintiff McDougle stated in the sole declaration provided to this Court regarding the FLSA notice issue: the plaintiffs in *Stebbins* stated, *inter alia*, that they were never notified in any manner that they would be paid less than the full minimum wage rate because they were receiving tips, and that they knew other servers in the putative class did not receive notice based on conversations that they had with certain specifically identified servers.  (*See* Exh. Q, Declarations of *Stebbins'* Plaintiffs.)  Plaintiff McDougle has conceded in this case that he has no idea what other servers were told about their compensation structure.  (*See supra*, p. 16.)  In response to the declarations filed by the *Stebbins* plaintiffs, S&P's general manager submitted a declaration (as Ms. Benzing and others have done here) directly rebutting the statements made by the servers.  *Stebbins*, 2017 U.S. Dist. LEXIS 216367, at *11; (Exh. R, Declaration submitted by *Stebbins'* Defendant.) S&P also submitted the employee handbook but Judge Thompson noted that he could not locate in the handbook the information about the tip credit that S&P represented was there.  *Id.* at *11, n.1. Nonetheless, and without making any conclusions regarding the merits of these competing affidavits, Judge Thompson denied class certification because he determined that individualized inquiries were necessary to determine whether the FLSA notice provision had been violated with respect to each member of the putative collective.  *Id.*

Putting aside that the evidence in this case demonstrating that Dakota satisfied the FLSA notice requirement is much stronger than that which S&P presented in *Stebbins*, the issue of collective treatment is the same. It is "inappropriate" to grant conditional certification when the evidence demonstrates that an individualized inquiry is required to determine everything that was conveyed to each server.  *See Stebbins*, 2017 U.S. Dist. LEXIS 216367, at *11.

In addition to *Stebbins*, courts have denied conditional certification in FLSA tip notice cases where the only "evidence" of a common policy is pure speculation.  *See, e.g.*, *Shala v. Dimora Ristorante, et. al.*, Civ. No. 2:16-03064(WJM), 2016 U.S. Dist. LEXIS 176316, at *6-7 (D.N.J. Dec.

21, 2016) (affidavit stating that "[n]o wait staff member, including [him], was given notice, whether oral or written, of Dimora's intention to take a tip credit towards their wages" was "pure speculation of a factual nexus between the manner in which the employer's alleged policy affected [him] and the manner in which it affected other employees"); *Roberts v. Apple Sauce, Inc.*, 945 F. Supp. 2d 995, 1004 (N.D. Ind. 2013) (plaintiff could not assume that what she was told about her wages was the same as what all other employees were told). Plaintiffs here have similar evidentiary failings.

## V.   IF THE COURT GRANTS CONDITIONAL CERTIFICATION, IT SHOULD NOT ADOPT PLAINTIFFS' PROPOSAL REGARDING THE NOTICE.

### A.   Plaintiffs Have Not Established Any Legal Basis for Equitable Tolling.

There is little to be determined regarding tolling as the parties had mutually agreed to toll the statute of limitations between September 13, 2017 and February 7, 2018 (Dkt. 52-1) and the Court ordered on March 26, 2018 that the statute of limitations be tolled until further notice. (Dkt. 70.) In any event, the Second Circuit has held that the plaintiff has the burden of showing equitable tolling is appropriate. *See Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000). To determine whether to apply equitable tolling, "the district court must consider whether the plaintiff (1) has proved that the circumstances are so extraordinary that the doctrine shall apply and (2) has acted with reasonable diligence during the time period she seeks to have tolled." *Zerilli-Edelgrass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003) (internal citations and quotations omitted); *Wallace v. Kato*, 549 U.S. 384, 396 (2007) (equitable tolling is "a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."); *Menominee Indian Tribe v. United States*, 136 S. Ct. 750, 756 (2016).

Plaintiffs first argue that they are entitled to equitable tolling based on Dakota's alleged failure to post required FLSA notices, and accordingly, that the statute of limitations should be tolled from February 15, 2014 through the end of litigation. (Dkt. 79-1., p. 24.) Plaintiffs, however, have not produced any evidence that the notices were not in fact posted, and Dakota has produced substantial

evidence that the notices were posted.  Moreover, an alleged failure to post FLSA notices is not, in and of itself, sufficient for equitable tolling.  *See, e.g., Upadhyay v. Sethi*, 848 F. Supp. 2d 439, 445 (S.D.N.Y. 2012).

Plaintiffs alternatively argue that they are entitled to tolling based on delays in this litigation.  (Dkt. 79-1, pp. 24-28.) Despite Plaintiffs' efforts to cast Dakota in a bad light, however, Dakota did not unduly delay this matter.  Plaintiffs' counsel consented to Dakota's 30 day extension of time to file responses to their discovery requests dated May 4, 2017.  (*See* Exh. S, Email Correspondence Between Plaintiffs' and Dakota's Counsel.)  Plaintiffs' counsel never asked for tolling at that time.  (*See id.*)  On July 5, 2017, Dakota provided its initial compliance with discovery.  (*See id.*) The parties then mutually agreed to attend mediation, and arrived at mutually agreeable terms for a Tolling Agreement.  Regardless, short delays in discovery are normal aspects of litigation and are insufficient grounds for tolling.  *See, e.g., Arena v. Plandome Taxi, Inc.*, No. Civ. 12-1078, 2013 U.S. Dist. LEXIS 58169, at *2 (E.D.N.Y. Apr. 23, 2013) (12 month discovery delay).

Thus, any alleged delay claimed by Plaintiffs does not rise to the level of "extraordinary circumstances" required for tolling.

### B. Plaintiffs' Proposed Notice Is Flawed.

The substance of the notice proposed by Plaintiffs and the manner in which they propose to disseminate it are not appropriate.  In addition, Plaintiffs' request for information about putative collective members is unwarranted and intrusive, and could encourage improper and unauthorized contact.  If, over Dakota's objection, conditional certification is granted, Dakota respectfully requests that counsel be given a period of three weeks from the issuance of any order granting conditional certification to "meet and confer" on the terms of a notice and the terms, if any, of disclosure of private putative class information relating to the notice.  *See D'Antuono v. C & G of Groton, Inc.*, No. 11-CV-0033 (MRK), 2011 U.S. Dist. LEXIS 135402, at *19 (D. Conn. Nov. 23, 2011) (ordering

parties to submit joint revised notice, and if no agreement, ordering parties to submit separate reports

explaining "disagreements and reasons for each party's respective preferences").

## VI.   CONCLUSION

The FLSA tip notice provision is not a trap.  It is intended to "inform" servers of the manner

in which they are paid.  Assuming this Court does not find that Dakota's evidence is sufficient to

establish the two named Plaintiffs got proper FLSA tip notice (or this Court does not make a merits

determination), the evidence and law makes clear that the only way to determine if there is an FLSA

tip notice violation in this case would be to conduct an individualized inquiry with respect to all 140

Dakota servers to determine what was conveyed to each server when they were interviewed, hired,

trained, tipped out (after every shift), or at any number of other subsequent occasions at Dakota when

servers may have asked Dakota managers various questions about their compensation.

Respectfully submitted
DAKOTA OF ROCKY HILL, LLC

By:   */s/ David R. Golder*
          David R. Golder (ct27941)
          Allison P. Dearington (ct 29277)
          Jackson Lewis P.C.
          90 Statehouse Square, 8th Floor
          Hartford, CT  06103
          Tel: (860) 522-0404
          Fax: (860) 247-1330
          golderd@jacksonlewis.com
          allison.dearington@jacksonlewis.com

40

## CERTIFICATION OF SERVICE

I hereby certify that on November 9, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated below.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ David R. Golder*_____
David R. Golder